

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

J.C. individually, and all others
similarly situated

:
:

v.

:

Nicholas Ford, Steffen Boyd,
Josette Springer, Shonda Williams,
John W. Harrison E. Martinez, Steven Austin,
Darlene Miller, Charles Hoyt

Civil Action No. **15     4745**

**Jury Trial Demanded**

## COMPLAINT

### JURISDICTION AND VENUE

1.     This is a civil action authorized by 42 U.S.C § 1983, First Amendment, Fourth

Amendment, Sixth Amendment, Fourteenth Amendment direct, Fourteenth Amendment

under 1983, all of the Federal Constitution,  Article I Section 8, of the Pennsylvania

Constitution, all due process clauses of federal and state law, to redress deprivations,

under color of state law, of rights secured by the Constitutions of the United States and of

Pennsylvania. This courthouse has jurisdiction under 28 U.S.C. Section 1331 for federal

claims and 28 U.S.C 1367 for the state claims. Plaintiff seeks declaratory relief pursuant

to 28 U.S.C Section 2201 and 2202. Plaintiff's claims for injunctive relief are authorized

by 28 U.S.C Section 2282 & 2284 and Rule 65 of the Federal Rules of Civil Procedure.

2.     This Eastern District is an appropriate venue under 28 US.C. § 1391 (b) (2)

### PARTIES

3. Plaintiff-victim is J.C. At all times by anyone Plaintiff to be referred to as J.C., Mr. C.,

or simply plaintiff, but nothing else. If someone ever uses Plaintiff's alleged name, they

will be sued directly, no matter who they are, or what they are purporting to be. Plus in

general there will be an additional 13 more suits in the next 25 years as well.

4. Defendant/offenders are:

Nicholas J. Ford, individual and official capacity City Hall, Room 369 Philadelphia
Shonda Williams individual and official capacity City Hall, Room 369 Philadelphia
Josette Springer individual and official capacity City Hall, Room 369 Philadelphia 19107
E. Martinez individual and official capacity City Hall, Room 369 Philadelphia 19107
John W. Harrison individual and official capacity City Hall, Room 369 Philadelphia
Steffan Boyd  individual and official capacity City Hall, Room 369 Philadelphia
Steven Austin  individual and official capacity City Hall, Room 369 Philadelphia
Darlene Miller individual and official capacity City Hall, Room 369 Philadelphia
Charles Hoyt individual and official capacity City Hall, Room 369 Philadelphia

5. At all times did the offenders act under the color of state law.

## STATEMENT OF CLAIM

5.     A lawsuit was filed against the majority of offenders in this complaint, in mid- July

2013[1]. At the end of July 2013, Plaintiff notified those offenders, including Ford and

Austin, about the suit, explained the procedure to them, explained they would get free

purported counsel, talked about the process. He didn't have to do that at all, Plaintiff

already knows the process, but he did it solely for their knowledge and benefit, so they

can get a better understanding.

6.    On August 22nd, 2013 Plaintiff went in for his first office visit with Ford since the

protected activity of filing the lawsuit and also the relaying of it. Right away the

punishment began as Ford immediately throws a tantrum about the lawsuit, angrily

---

[1] This is public record and does not need to be attached.

claimed Plaintiff would not succeed, said Boyd is "angry" with you and wanted to be

there (in the meeting) but he was not there that day. Ford demanded Plaintiff drop the

suit. Plaintiff said he was not dropping anything and warned Ford about more another suit

for his illegal and out of control behavior. Ford said "did you ever hear about the boy

who cried wolf", Plaintiff interjected that as Ford knew the wolf has repeatedly bitten,

Plaintiff's rights have already been violated fifty times and this isn't crying to begin with.

Ford then said "I am making sure the judge is told you sued me, so maybe she can end

it". Plaintiff told him that his attempt at this particular punishment is not a good idea at

all, it will lead to more trouble.

    At that point, Ford said "I have something for you" and gave Plaintiff a retaliatory

completely random, warrantless, suspicionless urine test/ search to take, which was clear

punishment for the suit and/or Plaintiff not agreeing to drop it. See exhibit A, it states

RANDOM on it, and they are married to that. Note, Ford had not had given Plaintiff a (an

already illegal to begin with) urine/test search in the prior months. This is another

instance where the temporal proximity speaks for itself. See Trulock v. Freeh, 275 F.3d

391, 405 (4th Cir. 2001) ("the timing of the search raises an inference of retaliatory

motive"); Stever v. Independent School District No. 625, 943 F.2d 845, 852 (8th

Cir.1991) (same).

7.    But the search is illegal from the door, before the punishment. Policies and

Procedures of that probation unit states all persons "**should be given a drug test on the**

**first office visit".** See attached exhibit B1, or prior filings we are already familiar with.

In Plaintiff's **case this was mid-2006.** The same policy document states "**monthly**

**urinalyses are conducted on all offenders if drug testing is ordered by the Court."**

3

See attached B2. However it was never ordered by anyone, Plaintiff never at any time

had that special condition, as Plaintiff just had the condition to pay 235.50 of court costs.

See Rules And Regulation of Probation and Parole attached as exhibit C.

County Probation and is controlled by 42 Pa. Cons. Stat. § 9754 and it dictates only a

**court**, not a probationer officer, but only a **court** can put conditions on someone.

## § 9754. Order of probation.

**(a) General rule.**--In imposing an order of probation the

**court shall** specify at the time of sentencing the length of any

term during which the defendant is to be supervised, which term

may not exceed the maximum term for which the defendant could be

confined, and the authority that shall conduct the supervision.

**(c) Specific conditions.--The court** may as a condition of

its order require the defendant:

Since section 9754 is a penal statute, courts must strictly construe this provision and

interpret any ambiguity in the light most favorable to the probationer. Commonwealth v.

Hall, 80 A.3d 1204, 1212 (2013) ("as a penal statute, Section 9754 must be interpreted in

the light most favorable to [the probationer]". But this isn't needed, it is plain language

and always has been since at least 1978.

Federal law, including here, was also clear for 65 years that imposing a sentence,

including conditions of probation, is a strictly judicial function that may not be

delegated. United States v. Pruden, 398 F.3d 241, 251 (3d Cir. 2005) "(This limitation

extends not only to the length of a prison term imposed, but also to the **conditions** of

4

probation or supervised release")[2]. See also United States v. Coates, 178 F.3d 681, 685 (3d Cir. 1999) (holding "that the fixing of restitution payments is a judicial act that may not be delegated to a probation officer"). FJD, Ford and other employees in different departments at probation have a custom, practice, and policy of administering/ conducting random, warrantless, suspicionless urine test/searches of all probationers even ones without the condition which is against federal and state law. A good number of these already illegal searches from Ford are used as punishment for the probationer for invoking their rights. This is an ongoing violation of federal law in a number of ways. This is enough already for bare minimum a fourth amendment claim.

8.     This right to be free from unreasonable searches both generally and in this context was long, long established.

The Fourth Amendment to the United States Constitution provides the following protections:

The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not beviolated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

See also Wilson v. Arkansas, 514 U.S. 927, 931 (1995) (The Fourth Amendment "protects `the right of people to be secure ... against unreasonable searches and seizures.'")[3] The people's "effects" include their personal property. See United States v.

---

[2] United States v. Johnson, 48 F.3d 806, 808 (4th Cir. 1995) ("[T]he imposition of a sentence, including any terms for probation or supervised release, is a core judicial function"); United States v. Heath, 419 F.3d 1312, 1315 (11th Cir. 2005) ("[D]elegating to the probation office the authority to decide whether a defendant will participate in a treatment program is a violation of Article III."); Whitehead v. United States, 155 F.2d 460, 462 (6th Cir. 1946) ("fixing the terms and conditions of probation is a judicial act which may not be delegated,"[2]).

[3] The Fourth Amendment is enforceable against the states through the fourteenth amendment. Camara v. Municipal Court, 387 U.S. 523, 528 (1967).

Place, 462 U.S. 696, 701 (1983). Personal property includes a person's bodily fluids, also being forced by the government to produce bodily fluids is an unreasonable breach of privacy as there is a substantial expectation of privacy in connection with the act of urination.

"It remains a cardinal principle that searches conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions." California v. Acevedo, 500 U.S. 565, 580 (1991). "Warrantless searches and seizures are presumptively unreasonable and are therefore prohibited under the Fourth Amendment, unless an exception applies." United States v. Mundy, 621 F.3d 283, 287 (3d Cir. 2010) (citing California v. Acevedo, 500 U.S. 565, 580 (1991)). "[T]he government bears the burden of proving that a search was reasonable where, as here, that search was conducted absent a warrant." United States v. Headen, 264 F. App'x 244, 246 (3d Cir. 2008) (citing United States v. Johnson, 63 F.3d 242, 245 (3d Cir. 1995)).

Likewise Plaintiff/Victim is fully protected under PA State constitution and governing law the same way, which provides support for his Fourth Amendment claim and also his Article I, Section 8. Pa. Const. art. I, § 8 reads[4]:

"The people shall be secure in their persons, houses, papers and possessions from unreasonable searches and seizures, and no warrant to search any place or to seize any person or things shall issue without describing them as nearly as may be, nor without probable cause, supported by oath or affirmation subscribed to by the affiant."

---

[4] "[B]oth the Fourth Amendment and Article I, Section 8 protect individuals against unreasonable searches and seizures, and warrantless searches or seizures are presumptively constitutionally unreasonable, subject to certain established exceptions" Commonwealth v. Brown, 23 A.3d 544, 553 (Pa. Super. 2011). See also Commonwealth v. Checkley, 558 Pa. 517, 738 A.2d 427 (Pa. 1999); Commonwealth v. Williams, 547 Pa. 577, 692 A.2d 1031 (Pa. 1997).

They believe "Article I, Section 8 of the Pennsylvania Constitution provides greater protection against unreasonable searches and seizures than is afforded by the Fourth Amendment to the United States Constitution". Commowealth v. Brown, 23 A.3d 544, 553 n.8 (Pa. Super. 2011)[5];  However it is clear that the "principal" object of the Fourth Amendment is the protection of privacy Warden, Maryland Penitentiary v. Hayden, 387 U. S. 294, 304 (1967). Either way Plaintiff is without question fully covered by both constitutions.

9.      For those who Ford and FJD can actually drug test/ search after the first visit, which are those with the special condition,  a personal search of the person 42 Pa Cons. Stat. 9912 states a probation officer may only conduct a search if there **is reasonable suspicion.** Even in a case where somebody does actually have the condition these searches here are so illegal that they still would be illegal. Longtime PA and federal  law indisputably establishes illegal retalitory, RANDOM, warrantless, suspicionless searches-are just that –illegal.  See Commonwealth v. Alexander, 16 A.3d 1152, 1156 (Pa.Super.2011) (en banc) ( There must be "**reasonable suspicion present** in order to protect a probationer's state and federal constitutional right to be free from unreasonable searches"). See also Commonwealth v. Galendez, 27 A.3d 1042, 1048 (Pa. Super. 2011), Commonwealth v. Hunter, 963 A.2d 545 (Pa. Super. 2008); Commonwealth v. Colon, 31 A.3d 309, 314-15 (Pa. Super. 2011).

---

[5] See also  Commonwealth v. Edmunds,  586 A.2d 887 (Pa. 1991)  ("Article I, Section 8 of the Pennsylvania Constitution. . . may be employed to guard individual privacy rights against unreasonable searches and seizures more zealously than the federal government does under the Constitution of the United States by serving as an independent source of supplemental rights."); Commonwealth v. Sell, , 470 A.2d 457, 468 (Pa. 1983) ("Article I, [§ ] 8 . . ., as consistently interpreted by [Pennsylvania courts], mandates greater recognition of the need for protection from illegal government conduct offensive to the right of privacy.)

Actually, this was hardly new or a surprise. All the way back in 1990 it was the same. Commonwealth v. Edwards, 400 Pa.Super. 197, 583 A.2d 445 (1990) (holding warrantless searches on parolees must at minimum be based upon reasonable suspicion of illegality). In Commonwealth v. Pickron, 535 Pa. 241, 634 A.2d 1093 (1993). PA again held that the Fourth Amendment does not permit the determination to conduct a search of a probationer or parolee to be left to the unfettered discretion of the individual officer. Rather, "some systemic procedural safeguards must be in place" to guarantee Fourth Amendment rights." Id. at 1098. In 2003, the same. Commonwealth v. Altadonna, 817 A.2d 1145, 1149 (Pa. Super. 2003) (holding that supervisee is not subject to diminished expectation of privacy regarding searches of supervisee's person; probation officer must have reasonable suspicion to seize and search probationer).

In 2007 nothing was different. "We hold that reasonable suspicion is indeed required in such a case, that it was lacking here, and that the search conducted was therefore improper." In the Interest of J.E., 937 A.2d 421, 422 (Pa. 2007) (warrantless search of PA probationer was illegal because there must be reasonable suspicion and it was not there). All of these cases also reaffirm "parole" (here county probation), "is not so broad in scope as to permit total disregard for the panoply of a parolee's [F]ourth [A]mendment rights." Commonwealth v. Edwards, 400 Pa.Super. 197, 583 A.2d 445 (1990) Commonwealth v. Berry, 265 Pa.Super. 319, 324, 401 A.2d 1230, 1232 (1979). Yet again they reaffirmed this long running rule of law in Commonwealth. v. Wilson, 67 A. 3d 736 (Pa. May 28th, 2013), and also ruled that not even sentencing courts can direct that a probation officer may conduct warrantless, suspicionless searches of a probationer. A judge can't do it legally, BECAUSE IT'S ILLEGAL.

8

It was also long clearly established in the Third Circuit obviously holds the same thing and nothing else in regards to the issue here in PA. United States v.Baker, 221 F.3d 438 (3d Cir. 2000), again held that in PA a parole/probation officer must have reasonable suspicion to conduct searches and for the search to be valid, the officer's decision to conduct the search "must be based on specific facts" that would articulate suspicion. Id at 444[6]. The reasonable suspicion standard requires a "level of objective justification," Illinois v. Wardlow, 528 U.S. 119, 123 (2000)[7].

A mere suspicion or hunch insufficient to provide reasonable suspicion. Terry, 392 U.S. at 27; Wardlow, 528 U.S. at 12; Commonwealth v. Tither, 671 A.2d 1156, 1158 (Pa. Super. 1996). Not a mere hunch of or a fishing expedition to harass a victim and maybe come out of it with some type of technical violation. In United States v. Williams, 417 F.3d 373, 376 (3d Cir. 2005), again held Pennsylvania's "implicit requirement that any search be based on reasonable suspicion.'" Id. at n.2 (quoting Baker, 221 F.3d at 448)[8]. Baker has never been overturned is still the standard being used, still good law. See United States v. Lynch, 2012 WL 256038 (3d Cir. Jan. 30, 2012), US v. Webster, No. 10-1245 (3d Cir 2010); United States v. Yeager, 351 F. App'x 718 (3d Cir. 2009); United States v. Noble, 326 F. App'x 125 (3d Cir. 2009). See also U.S. v. Perminter, (W.D.Pa.

---

[6] Baker held it was unreasonable for the parole officer to search the defendant's car trunk, even though he had committed a parole violation -- driving without a license -- that was -- at least tangentially -- connected to the car and law enforcementofficers may have been concerned about who owned the car.

[7] See also Ornelas v. United States, 517 U.S. 690, 696 (1996) (Reasonable suspicion requires an "objective basis" for suspecting the person [searched] of criminal activity); United States v. Sokolow, 490 US 1, 7 (1989) ("[t]he Fourth Amendment requires a "level of objective justification') (INS v. Delgado, 466 U.S. 210, 217 (1984) ( "Reasonable suspicion requires a " level of objective justification"); United States v. Cortez, 449 U.S. 411, 417-18 (1981). (reasonable suspicion requires an "articulable" and objective basis for suspecting the particular person . . . of criminal activity).

[8] They mentioned a Supreme Court case in another state that agents need "reasonable suspicion that a probationer subject to a search condition is engaged in criminal activity." United States v. Knights, 534 U.S. 112, 121 (2001).

2012); U.S. V. Rivera, 727 F. Supp. 2d. 367 (E.D.PA 2010); US v. Dono (E.D.Pa. March 17th, 2011) (N. disGrace). ("The United States Court of Appeals for the Third Circuit has concluded that parole officers acting pursuant to Pennsylvania's warrantless search condition must have reasonable suspicion" citing Baker).

The searches are illegal ill-defined fishing expeditions falling far short to establish reasonable suspicion of criminal or illegal activity, the first reason is because THEY SAY SO RIGHT ON THEM. As held squarely in Baker, "Pennsylvania law does not license such fishing". U.S. V. Rivera, 727 F. Supp. 2d. 367, 376 (E.D.PA 2010).

10.     In addition to all of this, Plaintiff, like all others similarly situated, which are those who are given a search/urine test by Ford (or whoever else) was seized, for the entire time which usually takes 60-90 minutes because of the wait, because he was not free to leave the building unless he did produce his bodily fluids. It is a violation of probation to leave without giving the fluids up.  It is a governmental termination of freedom of movement through means intentionally applied. Any reasonable person knows or should know that given this longtime policy, they are not free to ignore the search, just leave the building and continue with their business of the day. Victim was unlawfully seized that day for 80 minutes, without a warrant, without any reasonable suspicion.

11.     During this same August 22nd, 2013, meeting Plaintiff repeatedly demanded the latest perjured script Ford labels "summary sheet" for an upcoming September 6th, 2013 hearing, Ford refused to give it to him, claiming he would get it at the hearing. Plaintiff replied that is a violation of due process, Ford ignored this and still refused.

12.   On September 6th, 2013, Plaintiff attended a probation hearing in CJC. At some

point shortly after arriving, Plaintiff's name was called. Plaintiff said wait a minute, his

attorney is not here. After the hearing did start, John W. Harrison who is employed by

probation, retaliated against Plaintiff's Sixth (and probably First) Amendment right to

counsel and immediately told the robeowner presiding, "Oh he's not going on without an

attorney" referencing Plaintiff's right to counsel. Harrison continued to try to have

Plaintiff sanctioned/penalized because he simply wanted to wait until his legal

representation arrived.  Direct penalization for (at least) Sixth Amendment rights.

Everybody has that right, Harrison should not have even mentioned it all, let alone to a

robeowner in a probation hearing. Then Ford made good (again as Plaintiff would later

find out) on his earlier threat as Harrison punished Plaintiff again by telling the

robeowner, "He sued his p/o, he sued the supervisor, he sued the supervisor's

supervisor", referencing the lawsuit in which exactly that happen. Direct penalization of

First Amendment rights. This protected activity should never have been mentioned like

the above, let alone to a robeowner in a probation hearing.

13.   In addition to all of this Ford never gave Plaintiff  the perjured script he refers to as

a " "summary sheet" for this September 6th,  2013 probation hearing, Plaintiff never

received it before hand, during the hearing, or afterwards. He got a copy of the fantastical

sheet almost two years later, in connection with a prior suit. In addition to being part of

the  campaign of illegal retaliation, it was also a violation of due process[9].

---

[9]      Although revocation of probation is not part of the criminal prosecution, it entails the loss of liberty,
revocation of probation is a serious deprivation,  and due process must therefore be accorded.
Commonwealth v. Davis, 336 A.2d 616 (Pa. Super 1975). Commonwealth. v. Ferguson, 761 A. 2d 613,
617 (Pa. Super. 2000); Gagnon v. Scarpelli, 411 U.S. 778, 781-82 (1973); Morrissey v. Brewer, 408 U.S.
471, 481-82 (1972).

Due process safeguards means at minimum:

14.   On September 13th, 2013, Ford continued his campaign of illegal retaliation by planning and attempting to perform another retaliatory, illegal, unreasonable search. Ford went to Plaintiff's residence and literally starting punching the door. Not knocking, punching. This victim was not home at this time, but what became another victim of Ford's terror was.  The person that was in the residence thought the building was under siege, like an F.B.I raid or something. They placed a call to Plaintiff and he told them to calm down and not to panic, there might be a mistake, he asked them to identify someone if they could. The person then identified an individual that was almost identical to offender Ford. Plaintiff told the person, who was in fear for his life to try and stay calm and safe. He explained that he filed a lawsuit against Ford, that he would not drop it, Ford was irate and this was going on as punishment for that. Also to be extra careful because Ford suffers from severe mental illness that he refuses to treat.

---

(1) written notice of the claimed violations of probation or parole; (2) disclosure to the probationer or parolee of evidence against him; (3) opportunity to be heard in person and to present witnesses and documentary evidence; (4) the right to confront and cross-examine adverse witnesses, unless the hearing officer specifically finds good cause for not allowing confrontation; (5) a neutral and detached hearing body such as a traditional parole board, members of which need not be judicial officers or lawyers; and (6) a written statement by the factfinders as to the evidence relied on and reasons for revoking probation or parole.

Commonwealth v. Allshouse, 969 A.2d 1236, 1240 (Pa. Super. 2009);  (citing Gagnon v. Scarpelli, 411 U.S. at 786.

Here it was mandatory since five decades ago that written notice of each alleged violation and an adequate opportunity to prepare is required prior to hearing. Champion v. Com. Board Probation and Parole, 399 A.2d 447 (Pa. Cmwlth. 1979). Probation/parole officer must strictly comply with requirement that notice of alleged violations must be writing. Commonwealth v. Davis, 418 A.2d 669 (Pa. Super 1980). Requirement of written notice is a simple and straight forward requirement that the probation officer  must comply. Commonwealth v. Harris, 380 A.2d 471 (Pa. Super. 1977). With respect to right to receive written notice of alleged probation violation, actual notice by the way of oral advice or existence of a prior revocation proceeding was irrelevant. Commonwealth v. Parker, 378 A.2d 970 (Pa. Super 1977). Again, fundamental fairness is a key issue in a violation hearing. United States v. Hamilton, 708 F.2d 1412, 1414 (9th Cir.1983).

Ford literally punched the door for a solid 30 minutes, at couple of different points, he screamed off the top of his lungs (Victim's first name) in the middle of the street, causing a disturbance. Later on, when Plaintiff returned, he asked some people in the area about Ford's siege, they said the same thing he was screaming Victim's first name in the middle of the street, they heard him down a full block, screaming and beating on the door.

15. On September 19th, 2013 Plaintiff arrived on time for a 3:00 office visit. For reasons never known, Ford made Plaintiff wait a long time, then finally called him, so it was already much later when he walked in the booth. Ford speaks about the above September 13th, 2013, retaliatory search. He admitted he wanted to search the residence despite never attempting to prior to this, he had only visited one-time prior, seven months prior-long before he found out about the suit against him. In that visit, in which again took place before the suit was filed, Ford was not nearly as aggressive nor did he request to do a search. All of the sudden, after he found out he was being sued, he then did the above. See Trulock v. Freeh, 275 F.3d 391, 405 (4th Cir. 2001) ("the timing of the search raises an inference of retaliatory motive"); Stever v. Independent School District No. 625, 943 F.2d 845, 852 (8th Cir.1991) (same). This is another instance where the temporal proximity speaks for itself.

Ford  demanded to know who his victim was in the residence that day, personal information about them none of which was any of his business- at all. Ford wanted to terrorize a new victim, wanted to harass innocent people and would not accept no for an answer. Ford then went into asking into lengthy questioning about fifty other completely irrelevant things. This kept going on and with no end in sight. After this he brought up

the lawsuit against him again, what was the status  and asked if Plaintiff was going to end it. Plaintiff told him he was not going to end anything, and let Ford know that the reason why he has not been officially served was because Plaintiff was still trying to find out where the correct place was to do it. Ford then launched into a tirade, demanding Plaintiff drop the lawsuit. Plaintiff said no, he won't be bullied. Ford then said he would get the d.a. to file charges against Plaintiff if he did not drop the suit. Plaintiff told Ford that this is illegal and said it would lead to more trouble for him. Ford at that point, said I am calling them (d.a.) now screamed "get out"! Then he picked up the phone and started dialing. Plaintiff at that point again warned him again this is illegal, which in turn Ford screamed even louder GET OUT!  It is unclear how far Ford ultimately got in this latest malicious prosecution attempt, however it is enough by itself, let alone with everything else.

16.     Not at all surprisingly Ford gave falsified accounts on the above on perjured scripts he calls summary sheets. In regards to the September 6th, 2013, (which Plaintiff did not receive until two  years later) for the entry for the August 22nd, 2013 office visit, with the exception of stating that the urine test/search was a retaliatory act, he gave a fictitious account of what went on, he never mentioned a single fact. Also in this same document, there is an entry made for July 30th, 2013, that Plaintiff made him and some other offenders aware of the lawsuit, and he mentioned some details of the suit like the exact amounts of damages, what capacity he and they were sued in, some of the facts relayed and so forth. This should never have been mentioned to any robeowner, any court related documents, let alone a probation hearing. It was oh I wanted you to know he sued me so go ahead and feel free to get him. Should not have ever been mentioned.

14

In regards to the October 9th, 2013, script again he gave a fictitious account of what went on. The entry describing the September 13th, 2013 siege, states Ford "knock[ed] and announce[d] for "about 10 minutes". A total joke, nowhere did it state the real facts of which include he was punching the door for at least 30 minutes and screaming Plaintiff's name in the middle of the street, causing a disturbance.  The entry describing the September 19th, 2013 states that Plaintiff first made Ford aware of the above lawsuit during this encounter. The problem with this is he has in writing in the prior script that he was notified on July 30th, 2013. Ford is so obsessed with harming his victims in every way, that he doesn't even stop and think about what he did prior sometimes. Once again, this should never have been mentioned to any robeowner, any court related documents, let alone a probation hearing. It was oh I wanted you to know he sued me so go ahead and feel free to get him.

To top this off, he also had the nerve write at 4:55 p.m. Plaintiff was asked to leave the building, but wanted to talk some more, and was angry he had to leave. Out of all things to make up, this one is really something. Plaintiff thinks Ford is lower than the bottom of the sea, but somehow on this day he just couldn't stop himself from wanting to talk to his buddy Nick, he was upset. Again not a single fact actually appears. He then repeats all of the above on this script on one dated October 31st,  2013, with the exception of the above portion related to the siege. Also, he gave falsified accounts on all of the above on what they purport to be (internal) notation that Ford authored.

17.    Shortly after this, the offenders continued with their retaliation right after they were served with the above lawsuit on November 7th, 2013. This was not a shock. The offenders including Ford, Boyd, Austin planned out their latest punishment, this time

using co-workers. On November 14th, 2013, Plaintiff went in for an office visit and a E.P. Martinez, who he never saw before, was the p/o. Plaintiff does not know this offender's, who is a spanish female's first name. Right away it was clear Martinez was on an agenda. Right from the start, she was abrasive and aggressive- for no reason, and she interrogated Plaintiff about things that were not relevant, long after the address portion in which Plaintiff said there were no changes. This is one of the only things Plaintiff might arguably have to legally give information on and even that would be protected by the Fifth Amendment at worst. Shortly in, Plaintiff said he knew what this was really about, they just got a lawsuit. Martinez glanced at Plaintiff like she knew it was coming, then glanced back at the computer not commenting on that statement, it looked like she was following step by step instructions.

Martinez continued her behavior, trying desperately to manufacture an issue. She then claimed their emergency contact was old and she demanded what she thought was a newer one, in a very confrontational manner. Plaintiff stated he did not wish to give a newer one, whatever they have should be sufficient. With this Martinez achieved her whole goal, as she then escalated her already combative behavior, to assert Plaintiff had to give a (purported) newer emergency contact. Plaintiff stated that he was well within his rights, he does not have to give one and is not. He mentioned that there is no rule or regulation anywhere stating he does, no law or case law. Martinez then asserted Plaintiff had to give her one "or else".

18.   Plaintiff again repeated what he had said. She then said "I am getting the supervisor". Plaintiff said just give me my next reporting date so I can go. In a commanding and authoritative tone Martinez said "no stay here". A reasonable person

16

would have known they were not free to ignore the command, just leave the building and continue with their business of the day, this includes the fact that the card was not signed and given a new date. Almost like it was rehearsed, on cue, not one, but two out of control, mouthy female supervisors, Josette Springer and Shonda Williams, come into the booth and immediately explode into a tantrum. This plan was right up their alley, because neither one of them can boss around males at their own house and in the public in general, so they go find their victims on Arch St.  Note, Martinez comes back into the booth as well, so it is the three of them and their one victim. Again, Plaintiff knew they just got served with a lawsuit so it was not a huge surprise.

Springer and Williams are yelling at Victim in a loud, threatening intimidating tone, demanding Plaintiff give what they felt was a newer emergency contact. Plaintiff again repeated he did not wish to give a newer one, whatever they have should be sufficient, he was well within his rights, no rule or regulation anywhere stating he does, no law or case law, he does not have to give one and is not. Springer and Williams then told Plaintiff, they don't care what is in the rules, he could not go anywhere unless he gave one. Plaintiff stated they could not do that, it's illegal, and they will get sued. They responded if Plaintiff does not give them one then, then Plaintiff would go to jail. Note, this meant Plaintiff would be there for about 40 days until a detainer hearing which would have been prolonged for a next available date due to limited availability of the robeowner assigned to the case.

Plaintiff  said no this is illegal and got up from the chair and went for the door, Springer yelled "sit down you're not going anywhere". Plaintiff again repeated the above, and they have no right to imprison him.  Springer and Williams again said Plaintiff was

17

going to jail if he did not provide them with one. Victim should not have given in even a little bit, but he gave them an attorney's name. Again, Victim would have basically spent 40 days in jail until a detainer hearing[10]. Later on, after the attorney's name was given in the debacle that day, Springer conceded Plaintiff was right, it is not in the rules or regulations, any law but still tried to assert basically she could do whatever she wanted, she can't and Plaintiff emphasized that again, and a verdict will also do that.

19.     Again, during this encounter, Plaintiff was without question seized, there was governmental termination of freedom of movement through means intentionally applied. This includes the facts of 1)  threatening presence of not one, not two, but three what they refer to themselves as officers 2) could not be stronger show of authority, loud, threatening intimidating tone, direct commands/words that compliance must be compelled  the use of words or a tone of voice suggesting that compliance with the officer's request might be compelled. A person need not make an attempt to leave in order to be seized. United States v. Mendenhall, 446 U.S. 544, 554 (1980). But here Victim did. Here there was no guessing, Plaintiff knew he was not free to leave. Any reasonable person would not try to escape. In addition, after he was already seized, he was threatened with more long term seizure.

20.     They did this even though they did not have any reasonable suspicion that Plaintiff was engaging in criminal activity[11]. They didn't even have reasonable suspicion that Plaintiff violated his probation in any way. Again, they had *Plaintiff*'s contact

---

[10] Note, if Victim had had been seized any further in jail, this would be a 50 million suit instead of one-half.
[11] Note there is no lower threshold here than anywhere else. Commonwealth v. Altadonna, 817 A.2d 1145, 1149 (Pa. Super. 2003) (reaffirming that supervisee is not subject to diminished expectation of privacy regarding searches of supervisee's person; probation officer must have objective reasonable suspicion to seize and search probationer); See also Commonwealth v. Gayle,449 Pa. Super. 247, 673 A.2d 927, 932 (1996) (probationers do not have diminished expectation of privacy involving stops and seizures).

information, he did not have to give any emergency contact, or what they purported to be a newer one. This is perfectly legal and not grounds for any violation technical or otherwise. Moreover, as the two big mouths are familiar with, and everybody else there, the proper procedure when they actually have probable cause someone violated probation, is to send a request to the post-trial unit in CJC, asking for a vop hearing/Gagnon I. They do not have authority to detain and/or imprison people on the spot for real violations, like not reporting, failed drug tests, so on. Likewise they do not have the authority to detain and imprison because someone didn't give them what they allege is a newer emergency contact.

21.    Nothing exactly like this had ever happened to Plaintiff in the nine years prior. But low and behold, just days after Ford and offenders were served, this happens. The temporal proximity again speaks for itself. The big mouths closed out their time Plaintiff has obtained what the offenders allege to be internal notation. Of course they gave a completely falsified account as to what happened. There are two entries for that day/meeting/imprisonment, one by big mouth Springer and one from of all people- Ford, despite him not being there at all that day! When they file their perjured script/response to this lawsuit, in it somewhere they are going to allege Ford was not even Plaintiff's p/o on this date, not only this but he was not even in the same unit as Plaintiff

    That lends yet even more support (which isn't even needed) for this claim. Just got served, set-up and conspired with other employees to punish Victim, then is actually making an entry for a meeting/seizure/imprisonment that took place with three people, and he was not one of them, and he somehow did this despite the fact that they are going to say Ford was not Plaintiff's p/o, he was not even in the same unit as Plaintiff was at

that time. It's noteworthy, that in Ford's entry he stated Plaintiff "did not want provide

emergency contact. PP was advised he needs an emergency contact. PP provided

lawyer". Even this of course does not detail the above facts as it conveniently leaves them

out, he words it as if this was a harmless encounter, simply advised and oh he gave one.

And again he was not even there that day.

22.     On May 30th,  2013,  Nicholas Ford, first knowingly and intentionally violated

Plaintiff's physician-patient confidentiality. Ford knowingly and intentionally acquired

Plaintiff's private, confidential, federal and state protected  medical records from a

certain unnamed practice. In addition to acquiring this protected information over the

phone, Ford was so eager to retaliate and also violate federal and state health laws, that he

provided a fax number and facilitated the protected information/ records/ documents to be

faxed in. Ford full well knew that what he was doing was illegal, Plaintiff never gave

anyone consent, never waived any privilege at any time for any one. Instead of saying to

himself, and/or to anyone else for that matter, wait a minute I should not be violating

state and federal law, let me not do this, he chose to violate the law- yet again.

Ford then subsequently published this protected information and gave it to more and

other third parties, numerous people like other employees of probation including Boyd,

district attorney's office, and the court system. He did it again on with a September 6th,

2013 dated document. As a result of Ford's illegal and malicious publishing, numerous

people saw and also have Plaintiff's protected, confidential medical

information/records/documents. Obviously, he never had any type on consent to do that

as well. He continued his violations, in March of 2014, when he then gave the

information/records/documents to a purported law firm Archer and Greiner, including

20

Oleg Nudelman and Jeffrey Scott, numerous others they refer to as employees that worked on the case saw and have these.  Obviously, he never had any type on consent to do that as well.

Ford caused the information/records/documents to be filed in the Eastern District, where somebody who purchased a robe saw it and has it, probably gave it to numerous others, also this person's staff  masquerading as clerks and whatnot saw it and have it, as part as permanent file that can be accessed by pretty much anyone there for years to come. Obviously, he never had any type on consent to do that as well.

Ford's violations continued in January of 2015, where he caused to give information/records/documents to another purported law firm  Marshall, Dennehey, Warner, Coleman, Goggin, numerous people there including Criminal Boyle and others saw and have this. Obviously, he never had any type on consent to do that as well.

23.     The above falls under First Amendment retaliation, because it was let me get him, let me be malicious and violate his federal and state medical information rights, oh you want to sue, let me do it again, anybody want the records, here you go, multiple copies disseminated everywhere. It also falls under PA breach of physician-patient confidentiality. "Under prevailing Pennsylvania law, a breach of physician-patient confidentiality gives rise to a distinct cause of action" <u>Burger v. Blair Medical Associates, Inc.</u>, 964 A.2d 374, 378 (Pa. 2009). It is governed by a two-year limitations period. Id at 381. Here Ford's conduct is part of a continuing practice that continues through today. Also the records still being given out, they are still with others permanently.

24.   Plaintiff wants to make clear that by having a claim like this, which is dealing with (intentional) breaching of private confidential health records, does not mean they or anyone else for that matter has a license to continue to do it in the future in conjunction with this claim. No one has any consent whatsoever to disclose, publish, disseminate, violate Victim's rights some more. If it happens, even one time, they have Hippa and related complaints and a lawsuit for 1 million dollars, as well, and I will sue everybody involved, including that either gives or receives it.

25.   Boyd was at all times in this complaint Ford's direct supervisor. Austin at all times in this complaint was Boyd's supervisor. Miller at all times in this complaint was the "deputy chief" of probation. At all times was Hoyt the "chief" of probation[12] and is a policymaker[13]. Obviously, these offenders including Ford, Boyd, Austin, Hoyt, prior to these violations right here and thereafter, had been the subject of complaints and litigation asserting that they engaged in a pattern of similar violations. They also failed to respond to grievances and complaints in this suit's violations.

The First Judicial District, Boyd, Austin, Miller, Hoyt, failed to properly supervise, discipline, control, train and acted with deliberate indifference to the needs of Plaintiff and other victims and all of which caused direct harm to this victim and all others similar situated. Boyd, Austin, Hoyt, and Malvestuto also participated in violating plaintiffs rights, directed others to violate them, all had knowledge of and acquiesced, approved, ratified, Ford and whichever subordinates were below them's violations. They failed to

---

[12] Hoyt was the "deputy chief" of probation until Malvesuto took off right after he was notified of the above lawsuit, and Hoyt then apparently took his position right at the start of this suit's time period. Miller then took Hoyt's at that time.

[13] The Chief's office facilitates uniform application of work rules, enhanced communication within the Department regarding policy and procedure, implementation of meaningful performance standards and evaluations and issues related to merit based evaluations, accountability and labor relations. See prior filings also a matter of public record on the internet.

take appropriate remedial or disciplinary action to prevent further constitutional violations by the Ford thereby causing the constitutional violations in this case.

26.    They encouraged, tolerated, ratified and have been deliberately indifferent to a pattern, practice and custom of and to the need for more or different training, supervision, investigation or discipline in the areas of:

A. The failure to properly train, supervise and discipline all employees regarding the use of searches (including urine tests and home) and seizures

B. The monitoring of employees like Ford whom they knew or should have known are suffering from emotional and/or psychological problems that impaired their ability to properly and legally function as probation/parole officers;

C. The failure to identify and take appropriate remedial or disciplinary action against employees, like the ones here, Ford and others, who were the subject of prior lawsuits and/or  internal complaints of misconduct/civil rights violations;

D. The failure to properly sanction or discipline officers, who are aware of and subsequently conceal and/or aid and abet violations of constitutional rights of citizens by other probation employees, thereby causing and encouraging employees, including the offenders in this case, to violate the rights of citizens such as the plaintiff and other vicitms. They have a policy of inaction.

All of the above have established and maintained a policy, practice and custom, ongoing violations of federal law of this which directly caused Plaintiff's harm.

27. At all times did Plaintiff act in a reasonable, legal, and appropriate manner.

28. **Victim Impact Statement**

We know Victim was terrorized repeatedly for months. He has suffered severe loss of liberty, due process, emotional and psychological injuries, anger, rage, personal humiliation, public embarrassment, fright, horror, grief, ongoing mental anguish and harm, anxiety, chagrin, mortification, worry, nausea, nightmares, loss of trust, fear, loss of enjoyment of life, impairment of reputation and a lot more. Victim is still suffering adverse affects.

29. First Amendment Retaliation Standard

There are numerous federal and state claims in this lawsuit, the following is the applicable standard and law on one, First Amendment retaliation. "Retaliation is always reprehensible, and, regardless of whether the underlying activity is constitutionally protected it is obviously improper for officers to invoke criminal laws for retaliatory purposes." Gericke v. Begin, 753 F. 3d 1, 6 (1st Cir. 2014). They have an unreachable burden is this case (both in fact and law). "Speech involving government impropriety occupies the highest rung of First Amendment protection.  Therefore, the defendants in the present case bear a truly heavy burden." McGreevy v. Stroup, 413 F.3d 359, 365 (3d Cir. 2005)[14].  To state a First Amendment Retaliation claim, a plaintiff need only show that the action was taken "at least in part because of the exercise of the protected conduct." Siggers-El v. Barlow, 412 F.3d 693, 699 (6th Cir. 2005).  It has long been established "that official retaliation for the exercise of any constitutional right creates an

---

[14] See also Connick v. Myers, 461 U.S. 138, 145 (1983) ("[S]peech concerning public affairs is more than self-expression; it is the essence of self-government"). Davis v. Ector County, 40 F.3d 777, 782 (5th Cir.1994) ("There is perhaps no subset of `matters of public concern' more important than bringing official misconduct to light."). Baldassare v. New Jersey, 250 F.3d 188, 195-96 (3d Cir.2001) (matters of public concern include exposure of corrupt practices by government officials).. Branton v. City of Dallas, 272 F.3d 730, 740 (5th Cir.2001) (exposure of official misconduct is of great consequence to the public)

actionable claim under Section 1983." <u>Anderson v. Davila</u>, 125 F.3d 148, 161 (3d Cir.1997).

With First Amendment retaliation, "the motives of government officials are indeed relevant, if not dispositive, when an individual's exercise of speech precedes government action affecting that individual." <u>Anderson</u>, at 161. "Government actions, which standing alone do not violate the Constitution, may nonetheless be constitutional torts if motivated in substantial part by a desire to punish an individual for exercise of a constitutional right." <u>Mitchell v. Horn</u>, 318 F.3d 523, 530 (3d Cir. 2003). See also <u>Pratt v. Rowland</u>, 65 F.3d 802, 806 (9th Cir. 1995) (to prevail on a retaliation claim, plaintiff need not "establish an independent constitutional interest" was violated). It's long been clear that an actionable claim for retaliation "is not based on harshness of sanctions but the imposition of any adverse action for the exercise of free speech". <u>Bennis v. Gable</u>, 823 F.2d 723, 731 (3d Cir. 1987). The "'deterrence threshold,' . . . is very low"... "even 'an act of retaliation as trivial as failing to hold a birthday party for a public employee,' if 'intended to punish her for exercising her free speech rights,' may be actionable . . . ." <u>O'Connor v. City of Newark</u>, 440 F.3d 125, 128 (3d Cir. 2006)[15]. We also know "any form of official retaliation for exercising one's freedom of speech, including prosecution, threatened prosecution, bad faith investigation, and legal harassment, constitutes an infringement of that freedom" <u>Smith v. Plati</u>, 258 F.3d 1167, 1176 (10th Cir.2001). Even

---

[15] The circuits are clear there is no place for retaliatory harassment and it is actionable. "[S]ince there is no justification for harassing people for exercising their constitutional rights, [the deterrent effect] need not be great in order to be actionable." <u>Siggers-El v. Barlow</u>, 412 F.3d 693, 701 (6th Cir. 2005); <u>Suppan v.Dadonna</u>, 203 F.3d 228, 235 (3d Cir. 2000). "The effect on freedom of speech may be small, but since there is no justification for harassing people for exercising their constitutional rights it need not be great in order to be actionable." <u>Bart v. Telford</u>, 677 F.2d 622, 625 (7th Cir. 1982). The injury asserted is the retaliatory accusation's chilling effect on Hines... First Amendment rights... We hold that Hines failure does not demonstrate a more substantial injury does not nullify his retaliation claim." <u>Hines v. Gomez</u>, 108 F.3d 265, 269 (9th Cir. 1997), cert denied, 118 S.Ct. 2339 (1998).

a "'the threat of invoking legal sanctions and other means of coercion, persuasion, and intimidation,'" can show constitutional violation. White v. Lee, 227 F.3d 1214, 1228  (9th Cir. 2000).  Fear of retaliation may chill an individual's speech, and, therefore, permit the government to "'produce a result which [it] could not command directly.'" Perry v. Sindermann, 408 U.S. 593, 597 (1972).

Temporal proximity alone, like what Plaintiff has proven here, supports an claim of retaliation. Gonzalez-Droz v. Gonalez-Colon, 660 F.3d 1, 16 (1st Cir. 2011); LeBoon v. Lancaster Jewish Cmty. Ctr. Ass'n, 503 F.3d 217, 232-33 (3d Cir. 2007) ("Where the temporal proximity between the protected activity and the adverse action is unusually suggestive, it is sufficient standing alone to create an inference of causality). See also Trulock v. Freeh, 275 F.3d 391, 405 (4th Cir. 2001) ("the timing of the search raises an inference of retaliatory motive"); Stever v. Independent School District No. 625, 943 F.2d 845, 852 (8th Cir.1991) (same). Again, we know Plaintiff's protected activities including the lawsuit and subsequent continued refusal to drop it occurred sufficiently close in time to the adverse actions to establish retaliation

Moreover, actions that are otherwise proper and lawful may nevertheless be actionable if they are taken in retaliation against a person for exercising his or her constitutional rights. Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle, 429 U.S. 274, 283-84 (1977); Bloch v. Ribar, 156 F.3d 673, 681-82 (6th Cir.1998) ("[A]n act taken in retaliation for the exercise of a constitutionally protected right is actionable under § 1983 even if the act, when taken for a different reason, would have been proper"); Trulock v. Freeh, 275 F.3d 391, 405 (4th Cir. 2001), Wornell v. Henry, 219 F.3d 1197, 1215 (10th.

Cir. 2000); DeLoach v. Bevers, 922 F.2d 618, 620 (10th Cir. 1990); Matzker v. Herr, 748 F.2d 1142, 1150 (7th Cir. 1984).

Again, Plaintiff need only show that the action was taken "at least in part because of the exercise of the protected conduct." Siggers-El v. Barlow, 412 F.3d 693, 699 (6th Cir. 2005). Without question, Plaintiff has already proven at this point that the offenders' actions constituted retaliation from a combination of the chronological events.

30.    The offenders are being sued in their official capacity only for prospective relief. Will v. Michigan, 491 U.S. at 71 n.10 ("of course a state official in his or her official capacity, when sued for injunctive relief, would be a person under § 1983 because official-capacity actions for prospective relief are not treated as actions against the State"); Laskaris v. Thornburgh, 661 F.2d 23, 26 (3d Cir. 1981) [f]or purposes of the eleventh amendment the suit is against the officer as an individual although his action is still a 'state action' for purposes of Section 1983 and the fourteenth amendment.[16] Plaintiff notes he has established custom, practices, policies, ongoing violations of federal law. He notes prospective relief can be issued directly from the Fourteenth Amendment as well. He also notes prospective relief can be issued under state law/claims in this suit as well.

31.    If anybody starts to sneeze in somewhere in my direction, it will be in connection to this and the next suit will be 1,000,000 dollars. If I see the word Heck anywhere at all, or any phony attempt at confusion about what this suit is about, what it involves and

---

[16] No amendment or immunity extends to prospective relief against alleged or actual state agencies through state officials in official capacity. Helfrich v. Commonwealth, 660 F.2d 88, 90 (3d Cir.1981); Russel v. Dunston, 896 F.2d 664, 667-68 (2d Cir. 1989), cert denied, 498 U.S. 813; Coakley v. Welch, 877 F.2d 304, 306 (4th Cir. 1988), cert. denied, 493 U.S. 976.. Mieners v. University of Kansas, 359 F.3d 122 (10th Cir. 2004); Frank v. Relin, 1 F.3d 1317, 1327 (2d Cir.1993). Even offenders who are granted absolute immunity still are not immune for injunctive relief liability. Jorden v. National Guard Bureau, 799 F.2d 99 (3d Cir. 1986). Monetary relief that is "ancillary" to prospective relief also is not barred by any Amendment or immunity. Edelman v. Jordan, 415 U. S. 651, 667-668 (1974).

27

doesn't involve, there is going to be an additional 12 suits in the next 24 years. If any facts of this complaint do not appear accurately in any filing by others including one labeled an opinion there is going to be 13 more suits in the next 25 years. If any state claims are ignored, acting like they don't exist or are not part of this case there will be 4 more suits in the next 8 years. If they City pays/hires for purported counsel in this case there will be an additional 3 more suits in the next 6 years. They have absolutely no authority anywhere to do such a thing, if they did there would be one other case, one other victim, however there is not. The City is bankrupt, the last thing they need to be doing is paying out costly legal fees as dirty work for a non-entity. The citizens of Philadelphia deserve better- a lot better like this money being put to proper trash collection, street and park repair, transportation, schools, quality of everyday life which is very low.

If any frivolous "defenses" are raised there will be an additional 6 suits in the next 12 years. Any perjury, assisted perjury, false statements of material fact, frivolous "defenses" or legal claims, there is going to an additional lawsuit for that, 9 suits in the next 18 years and also sanctions motions, misconduct complaints with the Eastern District, PA Board, Bar Association and more. If any obstruction of discovery (if it's even needed) including depositions and production of documents, then the same. If Rossi, or any invalid like Mattioni, last Straw, whoever does not answer this complaint within 21 days, then the above will happen instead of a default being filed.

## CAUSES OF ACTION

### 32. COUNT I: 42 U.S.C. §1983

 Plaintiff incorporates by reference paragraphs 1-31 of this Complaint.

33. **COUNT II. Fourth And Fourteenth Amendment**

Plaintiff incorporates by reference paragraphs 1-31 of this Complaint.

34. **COUNT III: Sixth Amendment/Six Amendment Retaliation**

Plaintiff incorporates by reference paragraphs 1-31 of this Complaint.

35. **COUNT IV: PA Article I Section 8**

Plaintiff incorporates by reference paragraphs 1-31 of this Complaint.

36. **COUNT V. PA Breach Of Physician-Patient Confidentiality**

Plaintiff incorporates by reference paragraphs 1-31 of this Complaint.

## DEMAND FOR RELIEF

(a) A jury trial on all issues (if a trial is even needed as Plaintiff has already proven his case)

(b) Punitive damages against every offender individually in the amount of 500,000

(c) Compensatory damages against every offender individually, in the amount of 500,000 dollars

(d) Presumed damages against every offender individually

(e) A declaration that the acts and omissions described herein violated plaintiff's rights under the Constitutions and laws of the United States;

(f) Permanent injunction forcing the offenders to destroy the above confidential medical records, also all probation records dealing with Plaintiff (after Plaintiff wins this suit)

(g) Permanent injunction forcing Adult Probation/Parole to end their illegal practice of random urine test/searches to everybody and 1) not urine test/search people (and

subsequently seizing) who do not have it as a special condition 2) for the ones that do, only after at minimum well-founded objective reasonable suspicion

(h) Permanent injunction terminating Nicholas James Ford's employment with FJD and barring him from ever being employed by FJD, the City of Philadelphia, or another probation department/court system in another county; or in the alternative force Ford to go through intensive inpatient mental health treatment including all the medication he needs, then if should be released, then intensive outpatient including continuation of the medication. Note, Plaintiff isn't big on agreements, but he would agree to have status hearings on Ford's cooperation and level of success in treatment. Plaintiff has attached Ford's PJI, which includes a mental health evaluation. See exhibit D.

(i) Plaintiff's costs in this suit

(j) Pre judgment interest

(k) Post judgment interest

(k) Any additional relief that is deemed just, proper, and equitable.

## VERIFICATION

I have read the foregoing complaint and hereby verify that the matters alleged therein are true, except as to matters alleged on information and belief, and, as to those, I believe them to be true. I certify under penalty of a perjury that the foregoing is true and correct.

Executed at Philadelphia, Pennsylvania

J.C.
Box 934
Philadelphia, PA 19105

Dated: August 17th , 2015

# CHAIN OF CUSTODY FORM

A



## PHAMATECH, INC.
10151 Barnes Canyon Road, San Diego, CA 92121
**TOLL-FREE: 1-877-635-5840**

SPECIMEN ID NO. **6001276590**     LAB ACCESSION NO.

**STEP 1: TO BE COMPLETED BY COLLECTOR OR EMPLOYER/AGENCY REPRESENTATIVE**

A. Employer Name, Address and I.D. No.

First Judicial District
100 Cruit Street
Philadelphia PA 19100
Ph: 215-683-7440  Fax: 215-683-7450

B. Collection Site Address:

First Judicial District
100 Cruit Street
Philadelphia PA 19100

Collector Phone No. ( ) 215-683-7440

Collector Fax No. ( ) 215-683-7450

PP# ▒▒▒▒  Donor Name (▒▒▒▒▒▒ enter as donor id)

C. Donor SSN or Employee I.D. No.      D. Donor ID    Verified By:  ☐ Photo I.D.  ☐ Employer Rep

E. Reason for Test:  ☐ Pre-Employment  ☒ Random  ☐ Reasonable Suspicion/Cause  ☐ Post Accident  ☐ Periodic  ☐ Other

**STEP 2: TO BE COMPLETED BY COLLECTOR**

| Read specimen temperature within 4 minutes. Is temperature between 90° and 100°F? ☒ Yes ☐ No, enter remarks | Specimen Collection: ☒ Single ☐ Split | ☐ None Provided (Enter Remarks Below) | ☐ Observed (Enter Remarks Below) |
|---|---|---|---|

REMARKS:

**STEP 3: TO BE COMPLETED BY COLLECTOR AND DONOR** - Collector affixes bottle seal(s) to bottle(s). Collector dates seal(s). Donor intials seal(s).

**STEP 4: TO BE COMPLETED BY COLLECTOR AND DONOR**

TEST(S) REQUESTED BY EMPLOYER:

*Select Panel*

PO COMPLETES

JUDGE _M H_ ............... (enter as location)

DATE _8-22-13_ .......... (enter as collection date)    3703    3701

PO NAME _N Ford_ .......... (enter as collector)

PO PHONE # _1324_ .......... (enter as id #)    3870    3875

I authorize the collection of this specimen for the purpose of a drug screen. I acknowledge that the specimen container(s) was/were sealed with tamper-proof seal(s) in my presence; and that the information provided on this form and on the label(s) affixed to the specimen container(s) is correct. I authorize the laboratory to release the results of the test to the company identified on this form or its designated agents.

| (PRINT) DONOR'S NAME (LAST, FIRST, MID) | SIGNATURE OF DONOR | INITIAL | MONTH | DAY | YEAR |
|---|---|---|---|---|---|

**STEP 5: CHAIN OF CUSTODY - INITIATED BY COLLECTOR AND COMPLETED BY LABORATORY**

I certify that the specimen given to me by the donor identified on this form was collected, labeled, sealed, and released to the Delivery Service noted, in accordance with applicable requirements.

X _____
Signature of Collector

_3 22_ ☐ AM ☐ PM ►
Time of Collection

SPECIMEN BOTTLE(S) RELEASED TO:

UPS

_____
(PRINT) Collector's Name (First, MI, Last)

_____
(Mo/Day/Yr.) ►

Name of Delivery Service Transferring Specimen to Lab

RECEIVED AT LAB:

X _____
Signature of Accessioner ►

Primary Specimen     Bottle Seal Intact

_____
(PRINT) Accessioner's Name (First, MI, Last)

_____
(Mo/Day/Yr.) ►

☐ Yes
☐ No, Enter Remark To Right

B1

*Drug Testing* – All offenders should be given a drug test on the first office visit. Review adherence to medication if prescribed.

*Other* – Discuss treatment compliance and any other issues of concern to the offender.

## Content of Out of Office Visit

During the home or field visit, the officer should meet with the offender, family and/or professional staff and discuss any concerns about the offender.

Refer to the <u>Home Visit Policy</u> for further information.

## Content of Phone Contact

Offenders in MH should not report by phone unless there are extenuating circumstances. All communication with the offender via phone should be documented in Monitor.

## Missed Contacts

Within 24 hours of one missed appointment, the officer will send an arrest warning letter to all known addresses of record, directing the offender to report within one week of the missed appointment. If the offender fails to appear for the rescheduled appointment, a warrant must be issued.

## Arrest Screening—Other Jurisdictions

The officer will check JNET monthly for each assigned offender.

The officer will check daily for arrests. If the officer is absent the supervisor will assign another officer to perform this check.

## <u>VIOLATIONS</u>

## FJDMHC Offenders

If there is an issue of noncompliance with FJD███ offenders, the ████████ Court and PFACT work together to try to get the offender back into compliance. The goal here is to promote compliance, treatment participation and service appropriation with reduction in recidivism and re-incarceration. Every Monday, APPD staff communicates with PFACT workers regarding compliance of all offenders. APPD along with the judge make the final determination of actions taken in response to noncompliance.

## Absconder Status

After one missed appointment, the probation officer must send an arrest warning to the offender.

B2

If the offender fails to report on the date given in the arrest warning letter, the officer will issue a violation of probation warrant. The officer must verify that the offender is not in custody prior to issuing the warrant.

## New Arrests

For misdemeanor arrests of FJD████ offenders, the FJD████ judge conducts a status hearing to determine the course of action. Refer to the <u>Response to New Arrests Policy</u> for all other circumstances.

## Technical Violations

### *Drug Tests*

Monthly urinalyses are conducted on all offenders if drug testing is ordered by the Court. If the offender tests positive, they must be tested on each office visit with mandated treatment until negative testing results. If the drug test is positive for PCP, a warrant is issued immediately. The offender is referred to treatment on the first result positive for cocaine or opiates. If the offender tests positive a second time for cocaine or opiates, reporting is increased and treatment participation must be verified by the probation officer and upon confirmation, a VOP will be set up. If offender is not in treatment on the second positive, a warrant is issued. If there is a third positive prior to the VOP date, a warrant will be issued regardless of treatment status. A warrant will be issued after any subsequent positive results for these substances, regardless of the offender's treatment status. If the offender tests positive for marijuana, they will be referred to treatment, however continued use will result in a VOP

30-806 (Rev. 11/01)



# RULES OF PROBATION AND PAROLE

**COURT OF COMMON PLEAS**
**TRIAL DIVISION**
**Adult Probation and Parole Department**

## *(REGLAS DE PROBACION/*
## *LIBERTAD CONDICIONAL)*

| NAME OF PROBATIONER/PAROLEE *(Nombre del Delincuente)* | | POLICE PHOTO NUMBER *(Numero del Retrato Polician)* |
|---|---|---|
| | | |
| BILL AND TERM NUMBER *(Numero de Escrito y Termino)* C05091-267 | CASE NUMBER *(Numero de Caso)* | SUPERVISING DISTRICT *(Distrito de Supervisión)* |

The Honorable Judge __Dembe_____ has placed you on probation and/or parole and expects you to comply with the following Rules of Probation/Parole: *El Honorable Juez lo ha puesto en probacion y/o libertad condicional y espera que usted obedezca y cumpla las siguientes Reglas de Probacion/Libertad Condicional):*

1. You may not possess firearms or any other deadly weapons. *Usted no puede poseer armas de fuego o cualquier otra arma.*

2. Report to the Probation/Parole Officer as directed and permit the Officer to visit you at your home or place of employment when necessary. *Presentarse al Oficial de Probacion/Libertad Condicional como se le indique y permita que el Oficial lo visite en su casa o lugar de empleo cuando sea necesario.*

3. Respond promptly to any summons to appear in Court. *Responda puntualmente a cualquier cita para comparecer en Corte.*

4. Report any change of address to your Probation/Parole Officer within 72 hours, and do not leave Philadelphia without permission from your Probation/Parole Officer. *Notifique a su Oficial de Probacion/Libertad Condicional de cualquier cambio de direccion dentro de 72 horas, y no salga de Philadelphia sin el permiso de su Oficial de Probacion/Libertad Condicional.*

5. Make every effort to seek and maintain employment, and promptly inform your Probation/Parole Officer of any change in your employment status. *Haga todo el esfuerzo para buscar y mantener trabajo, e informe a su Oficial de Probacion/ Libertad Condicional cualquier cambio referente a su posicion de trabajo.*

6. Obey all federal, state, county criminal laws and city ordinances. *Obedezca todas las leyes federales, estatales, condado y municipales.*

7. You may not unlawfully possess, use, sell or distribute controlled substances of any kind. *Usted no puede poseer, usar, vender o distribuir substancias controladas de cualquier tipo.*

8. Notify your Probation/Parole Officer within 72 hours of any new arrest. *Notifique a su Oficial de Probacion/Libertad Condicional dentro de 72 horas de un nuevo arresto.*

9. You are subject by ACT NO. 35-1991 of the Pennsylvania General Assembly to pay a supervision fee to the Philadelphia Adult Probation Department unless the fee is waived by the Court. *Usted esta sujeto por Acta #35-1991 de la Asamblea General de Pennsylvania a pagar los honorarios por la supervision al Departamento de Probacion para adultos en Philadelphia, a menos que los honorarios sean renunciados por la corte.*

10. In accordance with ACT NO. 35 of the Pennsylvania General Assembly, Special Session NO. 1 of 1995, you are subject to a personal search and/or property search, including vehicle and the seizure of any contraband found, if there is reasonable suspicion to believe that you are in violation of any of the conditions of supervision. If you have accepted Accelerated Rehabilitative Disposition (ARD) as a result of a violation of 18 PA. C.S. Chapter 31 (relating to sexual offenses) you will also be subject to same search and seizure, if the Court has determined that you shall be subject to personal and/or property search as a condition of participation in the ARD program. *De acuerdo con el Acta #35-1991 de la Asamblea General de Pennsylvania, Secion Especial #1 de 1995, usted esta sujeto a un registro personal y/o a un registro de propiedad, incluyendo su vehiculo y el contenido de de cualquier contrabando que sea encontrado, si hay alguna sospecha razonable, para creer si usted esta en violacion de cualquiera de las condiciones de supervision. Si usted ha aceptado la Disposicion de Rehabilitacion Acelerada (ARD) como resultado de la violacion de (18 PA C.S. Chapter 31) Estado Criminal de Pennsylvania 18, Capitulo 31 (relacionado a offensas sexuales) tambien estara sujeto al mismo registro ya mencionado, si la corte determina usted sera sujeto para un registro de propiedad como condicion de su participacion en el programa de Rehabilitacion Acelerada.*

You will also comply with the following special conditions of Probation/Parole: *Usted tambien obedecera las siguientes condiciones especiales de Probacion/Libertad Condicional:*

$235.50 Per Court Costs.

5. Make every effort to seek and maintain employment, and promptly inform your Probation/Parole Officer of any change in your employment status. *Haga todo el esfuerzo para buscar y mantener trabajo, e informe a su Oficial de Probación/ Libertad Condicional cualquier cambio referente a su posicion de trabajo.*

6. Obey all federal, state, county criminal laws and city ordinances. *Obedezca todas las leyes federales, estatales, condado y municipales.*

7. You may not unlawfully possess, use, sell or distribute controlled substances of any kind. *Usted no puede poseer, usar, vender o distribuir substancias controladas de cualquier tipo.*

8. Notify your Probation/Parole Officer within 72 hours of any new arrest. *Notifique a su Oficial de Probacion/Libertad Condicional dentro de 72 horas de un nuevo arresto.*

9. You are subject by ACT NO. 35-1991 of the Pennsylvania General Assembly to pay a supervision fee to the Philadelphia Adult Probation Department unless the fee is waived by the Court. *Usted esta sujeto por Acta #35-1991 de la Asamblea General de Pennsylvania a pagar los honorarios por la supervision al Departamento de Probacion para adultos en Philadelphia, a menos que los honorarios sean renunciados por la corte.*

10. In accordance with ACT NO. 35 of the Pennsylvania General Assembly, Special Session NO. 1 of 1995, you are subject to a personal search and/or property search, including vehicle and the seizure of any contraband found, if there is reasonable suspicion to believe that you are in violation of any of the conditions of supervision. If you have accepted Accelerated Rehabilitative Disposition (ARD) as a result of a violation of 18 PA. C.S. Chapter 31 (relating to sexual offenses) you will also be subject to same search and seizure, if the Court has determined that you shall be subject to personal and/or property search as a condition of participation in the ARD program. *De acuerdo con el Acta #35-1991 de la Asamblea General de Pennsylvania, Secion Especial #1 de 1995, usted esta sujeto a un registro personal y/o a un registro de propiedad, incluyendo su vehiculo y el contenido de de cualquier contrabando que sea encontrado, si hay alguna sospecha razonable, para creer si usted esta en violacion de cualquiera de las condiciones de supervision. Si usted ha aceptado la Disposicion de Rehabilitacion Acelerada (ARD) como resultado de la violacion de (18 PA C.S. Chapter 31) Estado Criminal de Pennsylvania 18, Capitulo 31 (relacionado a offensas sexuales) tambien estara sujeto al mismo registro ya mencionado, si la corte determina usted sera sujeto para un registro de propiedad como condicion de su participacion en el programa de Rehabilitacion Acelerada.*

You will also comply with the following special conditions of Probation/Parole: *Usted tambien obedecera las siguientes condiciones especiales de Probacion/Libertad Condicional:*

$235.50 Per Court Costs.

## ACKNOWLEDGEMENT OF PROBATIONER/PAROLEE
### *RECONOCIMIENTO DEL DELINCUENTE*

I have read, or have had read to me, the rules and conditions of my Probation/Parole, as well as the Detainer/Violation Hearing Procedures and the Grievance procedures on the reverse side. *He leido, o me han leido, las precedentes reglas y condiciones de mi Probacion/Libertad Condicional; las he entendido completamente y estoy de acuerdo en cumplirlas.*

_____
**Witness (Testigo)**

_____
**Witness (Testigo)**

_____
Signature of Probationer/Parolee *(Firma del Delincuente)*
**NOTE: IF SIGNED BY A MARK, TWO WITNESSES MUST EXECUTE THIS INSTRUMENT. *(NOTA: SI LA FIRMA ES UNA CRUZ, DEBERA SER PRESENCIADA POR DOS TESTIGOS)***

8/14/06
_____
**Date (Fecha)**

PROBATIONER/PAROLEE

## PRE JUDGMENT INVESTIGATION

**Offender's Name:** Nicholas James Ford   **Age** 27   **Address** Northeast,  Philadelphia, PA

**Aka:** Criminal Ford, Crazy Nick, Sicky Nicky

**Identifying Information**

This is a 27 year old white male, born in 1987.  This is an evaluation authorized by Nick's

illegal, out of control and rights violating behavior

**Consent**:

Nick was made aware and gave consent

**Background/Social/Heritary History**

Nick was born to his father  James and mother Michelle, in Philadelphia, Pa in 1987.

**Home And Environment**

Nick says he has always lived in either Northeast or Fishtown, he says he rents now, doesn't

own anything, has always rented. Nick has shared with me in the past that he has a neighbor that

parks his motorcycle to close to his rental. Nick said this was an ongoing issue for him and he

was angry over it, he had asked me what his legal options were to which I explained not much.

This was situation where Nick did not have control over the guy the way he does his victims and

would be victims in other professions he did not make it too. This is a problem for Nick.

**Educational History**

Nick went to public school in the Northeast, which is nothing special. He said he did great.

After further investigation he was average at best, didn't excel in anything. He claims he

managed to graduate a local subpar college. Nick revealed to me he began medical school

locally, and was about a year in when they got into metaphysical data, Nick said it was too much

for him, he conceded he wasn't smart enough to take that on so he quit med school and started to look at what he really wanted to do.

## Physical/Mental History

Nick is about 6 feet tall and weighs about 180 lbs. Nick has dark brownish hair and has little to no facial hair. He says he has no tattoos. He reports no physical health issues and believes he is in good condition.

## MENTAL

Nick denies any history of hallucinations or suicide gestures

## Employment History

Nick says it was a dream of his to ruin people's lives, to be a puppet master. This is not a shock to me as I know Nick very well and pretty much figured this. He said he wasn't smart enough to become a lawyer, to pass the bar and therefore he could not ruin people's lives as a d.a. He also wanted to be a cop but was afraid he would get beat up when he went to rough up victims on the street or get shot. He said he also thought about being a c/o on State Road, loved the fact that he could control people and abuse that to an extreme degree but also did not want to get hurt, he thought it was too dangerous. He finally settled on being an out of control probation officer because he could do what he wanted to do, including acting like a d.a. in court, and it was safer, controlled environment making it harder for his victims to get to him. Nick said he filed an application and because they don't care who they hire and was accepted. He started in 2011,  I note Nick, because of his out of control illegal behavior, complaints from victims, was transferred three times already within that building between 2011 to 2014.

## Alcohol/Drug Evaluation

Nick reports he drinks alcohol but denies he abuses it. With regard to controlled substances, he denies the use of any. I doubt this, and he should be give random drug tests on the spot based on his bizarre and out of control behavior.

**Military History**

Nick never served in the military. He does not cite any further information in this context. Like jail, Nick probably would not last very long in the Army because he needs to control people and it would take a long time for him to be able to do that there, too long.

**Financial Status**

Nick says he rents an apartment. He says he doesn't own a vehicle, instead he takes Septa in for work. He states he earns 48,000 a year being the criminal that he is, and hopes to move up in rank and in pay. I tell Nick he with his out of control behavior his future is not looking bright for that plan.

**Marital History**

Nick states he is single and has never been married. I ask Nick if he gets a girlfriend and she is going to be hard to pull the strings, will he turn into the Nick we all know? He refuses to answer the question.

**Religious History**

Nick says he is catholic.

**Leisure Time Activities**

Nick says he like to go to Elton John concerts. I tell Nick only fruity guys go to Elton John concerts. Nick also says he likes to run. After further investigation, I find he ran a 5k, claiming to

be from the d.a.'s office- somewhere he couldn't get to. He was pathetic, it took him almost 30 minutes to finish the race, almost 10 minutes a mile, he finished in the 100's. Total joke, a cripple can just about beat that time. I tell Nick he should forget about any Olympic dreams. The only thing that Nick is good at appears in the next sections.

## Criminal History

Nick denies any arrests, denies he ever committed a crime. I then ask Nick about all his crimes against numerous victims including the author. Nick's issues come into play and he fails to realize his criminal behavior which is disturbing. I tell Nick he should be in jail and then lengthy probation just for what he did to this victim. Again his illness comes into play. I tell Nick he better not ever even get falsely arrested or imprisoned because he would not last a day in jail, any jail, even if none of his victims are there. He agrees.

## Mental Health Evaluation

This is the subject Nick dreads. Nick denied suffering from a mental health illness, however the evidence proves, not suggests but, proves. He has had numerous displays of illegal and also mentally disturbing behavior in the past but in regards to this matter, specifically the August 22nd, 2013 tirade, it was this outburst that prompted mental health treatment for Nick. Nick responded," how do you know I am not seeing someone"? I replied if you are, it isn't working, I have a new treatment plan for you. I had my doubts that Nick's comment meant he was, because it also could have meant generally you do not know what I am doing or not doing as opposed to inferring he in fact was seeking treatment for his mental illness. But again, if he was it obviously was not working. Nick is again denying he suffers from a mental health illness, however again, the evidence of all his criminal acts the past four years or so, against his victim

and hundreds others, all his bizarre tirades, other extremely disturbing behavior proves otherwise.

**Prognosis**

Nick is an out of control sociopath, with narcissism, and he is a pathologic liar, just to name a few. Nick needs to be put in jail and then lengthy probation or involuntarily committed for an indefinite period of time, if he is released, that is followed by intensive psychiatric treatment for a period of 15 years.

**Evaluative Summary**

Nick, 27, awaits justice here on his latest crimes against just one of many of his victims. Nick failed to mention all the negative things and issues detailed above, along with denying others, asserting something else. He did nothing special academically. Employment wise he is a joke, he managed to get one job, and already he has been transferred to three different departments because of his behavior, next time it is out the door. I note he would have been gone the first month in if he wasn't at such an out of control building with other excuses of probation officers. Nick has no real stake in the economic community as well. It seems interesting that a man that should either be in jail or committed for mental health treatment is still trying to continue his crimes, spending his limited resources torturing innocent victims, and trying to jail them.

In terms of punishment and treatment for this individual, the current mental health report is included in this report. As was stated in the evaluation, Nick needs to be needs to be put in jail and then lengthy probation or involuntarily committed for an indefinite period of time, followed by intensive psychiatric treatment for a period of 15 years.

I have Nick's p.s.i. on cd rom and hard copy as well, if anyone needs a copy of it just ask.


Dr. J.C.